**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROSE D., individually and as natural parent of her minor child, B.D.,

                                        Plaintiffs,

v.

THE SANDY CREEK CENTRAL SCHOOL DISTRICT and THE CENTER FOR INSTRUCTION, TECHNOLOGY & INNOVATION BOARD OF COOPERATIVE EDUCATIONAL SERVICES (CiTi BOCES),

                                        Defendants.

5:25-cv-01141 (BKS/MJK)

---

**Appearances:**

*For Plaintiffs:*
Carlo Alexandre C. de Oliveira
Cooper Erving & Savage LLP
20 Corporate Woods Boulevard, Suite 501
Albany, NY 12211

*For Defendant The Sandy Creek Central School District:*
Kate I. Reid
Bond Schoeneck & King, PLLC
One Lincoln Center
Syracuse, NY 13202

*For Defendant The Center for Instruction, Technology & Innovation Board of Cooperative Educational Services (CiTi BOCES):*
Adam Phillip Carey
Paul V. Mullin
Sugarman Law Firm LLP
211 West Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Rose D. seeks monetary damages on behalf of her minor son, B.D., from

Defendants Sandy Creek Central School District ("District") and The Center For Instruction,

Technology & Innovation Board of Cooperative Educational Services ("CiTi BOCES")[1] for

discrimination against B.D. in violation of Title II of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section

504"), 29 U.S.C. § 794. (Dkt. No. 1). Defendant District moves to dismiss Plaintiffs' complaint,

(Dkt. No. 14), and Defendant CiTi BOCES moves for judgment on the pleadings, (Dkt. No. 18).

The motions have been fully briefed. (*See* Dkt. Nos. 14, 16, 17, 18, 19, 22, 25). For the following

reasons, Defendants' motions are denied.

## II.    FACTS

The facts are drawn from Plaintiffs' complaint and B.D.'s Individualized Education

Programs (IEPs) from the 2017–18 to 2023-24 school years.[2] The Court assumes the truth of and

---

[1] Defendant CiTi BOCES stated that it is "improperly named" as The Center for Instruction, Technology & Innovation Board of Cooperative Educational Services, and that it is actually named the Oswego County BOCES. (Dkt. No. 18-8, at 3).

[2] The Court, on a motion to dismiss, or on a motion for judgment on the pleadings, may consider documents that, although not incorporated by reference, are integral to the complaint. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021). "A document is incorporated by reference if the complaint makes a clear, definite, and substantial reference to the document[]."*Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017) (alteration in original) (quoting *McLennon v. City of New York*, 171 F. Supp. 3d 69, 88 (E.D.N.Y. 2016)). "A document is integral to the complaint where the plaintiff '(1) has actual notice of the document and its information and (2) has relied on the documents in framing the complaint.'" *Id.* (quoting *McLennon*, 171 F. Supp. at 89). "However, 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

Here, the District attached B.D.'s IEPs from the 2017-18 to the 2025-26 school years to its motion to dismiss, (Dkt. No. 14-2 to 14-10), and CiTi BOCES attached B.D.'s IEPs from the 2022-23 to 2025-26 school years to its motion for judgment on the pleadings, (Dkt. No. 18-4 to 18-7). Plaintiffs have quoted from or referenced the IEPs from the 2017-18 to 2023-24 school years in their complaint, (*see* Dkt. No. 1, at 8–19), have not disputed the authenticity

2

draws all reasonable inferences from the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (standard for motion to dismiss); *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015) (standard for motion for judgment on the pleadings).

### A.    A. Diagnosis and Preschool: 2018-2019 School Year

Plaintiff B.D. is a ten-year old boy who was diagnosed with Autism Spectrum Disorder ("ASD") when he was in preschool in August 2018. (Dkt. No. 1, ¶¶ 11, 12, 31). B.D. attended a preschool within the District, (*see id.* at ¶ 35), a public elementary and secondary education system receiving federal financial assistance, (*id.* at ¶ 14). During that time, B.D. exhibited developmental delays, including language impairment and restricted, repetitive behaviors. (*Id.* at ¶¶ 31–32). These impairments hindered B.D.'s ability to engage in a "wide-variety" of activities, including learning new skills, participating in a group environment, and playing with other children. (*Id.* at ¶ 32). The team that evaluated and diagnosed B.D. recommended services "targeted at working with children with Autism Spectrum Disorder and designed to decrease self-directed behaviors and increase interactive skills," such as Applied Behavior Analysis ("ABA")[3] or Floor Time strategies. (*Id.* at ¶ 33). The evaluation team's report was submitted to the District's Committee of Preschool Special Education ("CPSE"). (*Id.* at ¶ 34).

Plaintiffs allege that after B.D. was diagnosed with autism, the District knew that B.D. experienced significant delays in cognitive, language, motor, and adaptive skills that impact his

---

or accuracy of these documents in their response briefing, and none of parties raise issues of fact as to the documents' relevance to this action. Therefore, the Court may consider B.D.'s IEPs from the 2017-18 to 2023-24 school years. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.3 (2d Cir. 2002) (citing cases).

[3] New York Education Law defines "ABA" as "the design, implementation, and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relationship between environment and behavior." N.Y. Educ. Law § 8801.

ability to learn and actively participate in school; that B.D. has social and emotional impairments that substantially limit his major life activities; that B.D. is nonverbal and needs an assistive technology device to address his communication needs; and that "comprehensive and intensive early ABA intervention was recommended to advance B.D.'s development, behavior, and functional capacity." (*Id.* at ¶¶ 39–40). The notes from B.D.'s IEP reevaluation in September 2018 acknowledged his developmental delays, particularly in language and cognition, and concluded that his self-directed behavior "significantly hinders his ability to develop his problem-solving skills, engage with a wide variety of age-appropriate activities, to demonstrate his skills, and to learn new skills." (*Id.* at ¶ 44; Dkt. No. 14-3, at 15).

Despite the District's knowledge of B.D.'s diagnosis, his evaluation team's recommendations, and the CPSE's findings from the IEP reevaluation, Plaintiffs allege that the District did not recommend any autism-specific programs or services, an assistive technology device, positive behavior interventions, or counseling. (Dkt. No. 1, ¶¶ 43–44). Instead, the CPSE recommended no change in the services B.D. had already been receiving before he was diagnosed, (*id.* at ¶ 44. *Compare* Dkt. No. 14-3, at 21, *with* Dkt. No. 14-2, at 8–9 and Dkt. No.14-3, at 8–9), which included an 8:1+2 (eight students to one teacher and two classroom aides) special class, thirty minutes of speech and language therapy four times per week, thirty minutes of occupational therapy twice per week, and thirty minutes of physical therapy twice per week. (Dkt. No. 1, ¶ 37; Dkt. No. 14-2, at 8–9; Dkt. No. 14-3, at 8–9).

In April 2019, the CPSE rereviewed B.D.'s IEP. (Dkt. No. 1 ¶ 46; Dkt. No 14-4, at 2–21). The IEP noted that B.D. remained nonverbal, was not independent in the classroom, and was not interacting with his peers. (Dkt. No. 1, ¶ 46; Dkt. No. 14-4, at 4–5, 14–15). The CPSE

recommended a reduction in B.D.'s speech and language services. (Dkt. No. 1, ¶ 46. *Compare* Dkt. No. 14-4, at 18, *with* Dkt. No. 14-4, at 10).

### B.    Kindergarten: 2019-20 School Year

B.D. started Kindergarten in September 2019, but according to Plaintiffs, he was placed in an integrated general education class, contrary to the CPSE's recommendation that he be placed in a special education class. (Dkt. No. 1, ¶ 47). Two months later, the District's Committee on Special Education (CSE) reevaluated his IEP (*Id.* at ¶ 48; Dkt. No. 14-4, at 22–37). The CSE noted issues with B.D.'s behaviors, including hitting his peers and adults and putting his hands and feet in the toilet. (Dkt. No. 1, ¶ 48; Dkt. No. 14-4, at 25–26). These behaviors were not happening at home. (Dkt. No. 1, ¶ 48).  To address B.D.'s regression, the CSE recommended an extended school year with speech and language services twice per week and occupational therapy and physical therapy once per week. (*Id.*; Dkt. No. 14-4, at 31). The CSE did not recommend any autism-specific programs or services, an assistive technology device, positive behavior interventions, or counseling. (Dkt. No. 1, ¶ 47).

### C.    First Grade: 2020-21 School Year

The next school year, when B.D. was in first grade, he continued behaving aggressively and began exhibiting self-harm. (*Id.* at ¶ 50). Again, the CSE did not recommend any autism-specific programs or services, an assistive technology device, or positive behavior interventions. (*Id.* at ¶ 51). Rather, the CSE recommended a reduction in B.D.'s speech and language services. (*Id.* at ¶ 49. *Compare* Dkt. No. 14-5, at 19, *with* Dkt. No. 14-5, at 7).

### D.    Second Grade: 2021-22 School Year

In October 2021, when B.D. was in second grade, the District conducted its triennial evaluation of B.D.'s IEP. (Dkt. No. 1, ¶ 55). B.D. was unable to complete standardized testing after multiple attempts were made. (*Id.*). For example, B.D. could not participate in a speech

evaluation because he was "unable to demonstrate an understanding of the test task." (*Id.* at ¶ 54; Dkt. No. 14-6, at 4). His language skills were informally tested, and he was found to have delayed receptive and expressive language and articulation skills. (Dkt. No. 1, ¶ 54; Dkt. No. 14-6, at 4). The overall evaluation concluded that B.D. "consistently fell within Extremely Low range in all adaptive composite areas" and that he has "significant delays in his day to day life and his ability to complete daily life tasks without significant intervention." (Dkt. No. 1, ¶ 55).

During that school year, B.D.'s aggressive behaviors escalated. (*Id.* at ¶ 57). In or around October 2021, B.D.'s pediatrician recommended starting him on an antipsychotic to address those behaviors. (*Id.* at ¶ 56). Plaintiff Rose D. requested the District to provide B.D. with ABA therapy in school, but the District denied the request. (*Id.*).

Due to the escalation of B.D.'s aggressive behaviors—which included physical aggression and noncompliant behaviors—a Functional Behavior Assessment was conducted in November 2021. (*Id.* at ¶ 57). B.D. was put on a Behavior Intervention Plan ("BIP") the same month. (*Id.* at ¶ 58). However, according to Plaintiffs, it was "ineffective in addressing B.D.'s target behaviors in that such aggressive behaviors continued to escalate resulting in revisions to the BIP in May and June 2022." (*Id.*).

Around the same time, in late April 2022, Plaintiff Rose D. informed B.D.'s principal and the District's superintendent that she was privately paying for ABA therapy at home and in an outside clinic. (*Id.* at ¶ 59). Because the school had not provided B.D. with an augmentative alternative communication device, Plaintiff Rose D. provided an iPad to help B.D. communicate at school. (*Id.*).

During the 2021-22 school year, the CSE did not make any changes to B.D.'s special education program or related services "despite B.D.'s lack of progress with his language,

6

functional, motor, and adaptive skills, including an escalation of his aggressive behaviors." (*Id.* at ¶ 52). Again, the CSE did not recommend any autism-specific programs or services, an assistive technology device, positive behavior interventions, or counseling. (*Id.* at ¶ 53).

### E.    Third Grade: 2022-23 School Year

When B.D. started third grade in September 2022, the CSE held a program review to discuss B.D.'s placement for his third-grade year and to address several behavioral concerns that had continued from the previous school year. (*Id.* at ¶ 60). These behaviors included "getting out of his seat without warning and running across the classroom, flipping over furniture, laying on the floor, refusing to follow adult directions, hitting, pinching, kicking, head-butting, biting, and pulling the hair of adults he is working with." (*Id.* at ¶ 60(d); Dkt. No. 14-7, at 6). The IEP reported that B.D. required "continual adult support in order to safely get through the school day." (Dkt. No. 1, ¶ 60(d); Dkt. No. 14-7, at 5). B.D. made zero percent progress on his goal to "complete presented activities independently on 4 out of 5 opportunities over three consecutive two week periods" due to his behavior. (Dkt. No. 14-7, at 5; Dkt. No. 1, ¶ 60(d)). In addition, B.D. presented with "significant sensory processing deficits" that affected his "ability to follow directions or complete tasks"; and in the prior academic quarter, he was unable to participate in tasks for more than one minute at a time." (Dkt. No. 1, ¶ 60(e); Dkt. No. 14-7, at 6).

Because of B.D.'s inability to participate in standardized testing, the CSE was unable to obtain a standardized score for his speech and language skills, but it was noted that his "delayed language and articulation skills impact his ability to meet his basic wants and needs, as well as, independently participate in the curriculum of his classroom." (Dkt. No. 1, ¶ 60(c); Dkt. No. 14-7, at 5). As for his progress with the curriculum, the IEP noted that B.D. "is not yet able to produce sounds of the alphabet," (Dkt. No. 1, ¶ 60(a); Dkt. No. 14-7, at 4), and that he had not

mastered math skills expected of second grade students, (Dkt. No. 1, ¶ 60(b); Dkt. No. 14-7, at 4).

The CSE recommended placing B.D. at CiTi BOCES, which is a board of cooperative educational services providing students with services unavailable in their school district. (Dkt. No. 1, ¶¶ 15, 61). CiTi BOCES receives federal financial assistance. (*Id.* at ¶ 15). The CSE recommended placing B.D. in an 8:1:2 special class with the same speech and language, occupational, and physical therapies that were recommended in his previous IEPs. (*Id.* at ¶ 61; Dkt. No. 14-7, at 9–10). In addition, "[f]or the first time since B.D. became a student eligible for special education services, the defendant [District], through the CSE, recommended counseling for B.D. 1 time per week beginning in October 2022." (Dkt. No. 1, ¶ 62; Dkt. No. 14-7, at 9). However, the CSE did not recommend any autism-specific programs or services, including ABA therapy, or any positive behavior interventions "to address B.D.'s lack of academic progress and behavior concerns." (Dkt. No. 1, ¶ 61). In November 2022, one month after B.D. started the CiTi BOCES program, the CSE increased the frequency of B.D.'s speech and language therapy to five times per week for thirty minutes. (Dkt. No. 1, ¶ 63; Dkt. No. 14-7, at 23).

Shortly after starting the CiTi BOCES program, B.D. "started having intentional urination incidents" at school, even though "he was potty-trained, including overnights." (Dkt. No. 1, ¶ 66). He also started putting his clothes and shoes in the toilet with such frequency that by March 2023, Plaintiff Rose D. was sending B.D. to school with three extra clean outfits every day. (*Id.*). She expressed her concerns to the principal, but he told her that the classroom aides were "not comfortable addressing B.D.'s behaviors from occurring and that they lacked the necessary training." (*Id.* at ¶ 68).

During a classroom visit in June 2023, Plaintiff Rose D. watched B.D.'s special education teacher remove B.D.'s shoe from the toilet with a gloved hand, instruct him to dry off his shoe with a paper towel even though she did not give him gloves, put the still-wet shoe back on his foot, and send him to eat breakfast without washing his hands. (*Id.* at ¶ 71). Plaintiff Rose D. questioned B.D.'s teacher about the incident, and she replied that the toilet water was clean. (*Id.*).

In addition to the toileting incidents, B.D.'s aggressive behaviors and emotional dysregulation continued to escalate, "resulting in physical injuries and other injuries to B.D." (*Id.* at ¶ 65). For example, in May 2023, B.D. came home with pattern bruising on his forehead. (*Id.* at ¶ 70). The staff at CiTi BOCES did not know how the bruising happened but acknowledged that the injury happened at school. (*Id.*). During that same conversation, staff told Plaintiff Rose D. that B.D. bit an aide, drawing blood and requiring the aide to get a tetanus shot. (*Id.*). B.D.'s injury was not documented, but the aide's injury was. (*Id.*).

Plaintiff Rose D. "made several appeals for support with ABA Therapy in the school environment, which were turned down." (*Id.* at ¶ 65). Because B.D.'s "physical aggression continued to escalate," she asked for a meeting with the CSE Chair, B.D.'s special education teacher, the CiTi BOCES principal, and an ABA therapist whom Plaintiff Rose D. personally hired (*Id.* at ¶ 69). During the meeting, Plaintiff Rose D. offered to pay the ABA therapist to help train the classroom aides and to provide B.D. with ABA at school. However, when she saw that the aides were not implementing the ABA therapist's recommendations, she stopped paying for the therapist's services at school. (*Id.*).

In June 2023, Plaintiff Rose D. met with the District's CSE chair and the superintendent to discuss B.D.'s aggressive behaviors and toileting incidents at school. (*Id.* at ¶ 72). She

9

described the toilet incident she observed earlier that month, and showed them "200+ pages of journal entries from B.D.'s aides, which showed numerous entries for self-injury, staff injury, aggression to peers/staff, injury by peers, and extensive toilet play/intentional urination incidents." (*Id.*). In addition, she told them that B.D. was bringing home four to five soiled outfits every day. (*Id.* at ¶ 73). Plaintiff Rose D. asked the District to provide B.D. with ABA therapy, but was told that the District was "unable to provide B.D. with this 'medical treatment.'" (*Id.*). In the alternative, B.D.'s mother asked for the District to investigate other programs that would better support B.D.'s needs, but the District did not recommend any other programs. (*Id.*).

The next month, Plaintiff Rose D. reached out to the District's CSE chair and superintendent again, "expressing her concerns for B.D's safety and stressing the very limited window of opportunity available for B.D. to address his communication and emotional impairments lest his development be permanently harmed." (*Id.* at ¶ 75). In another correspondence, she raised B.D.'s success with ABA therapy outside of school and asked the District to include it in his IEP, but the CSE chair said that she "had not heard of anyone doing ABA therapy through an IEP or the CSE process." (*Id.* at ¶ 74). The CSE chair also stated that the District was not able to offer transportation for B.D. to an ABA therapy clinic or to cover the cost of the therapy. (*Id.*).

On July 16, 2023, B.D. sustained another head injury while he was on a field trip with his class. (*Id.* at ¶ 76). That day, Plaintiff Rose D. informed CiTi BOCES and the District's CSE chair and superintendent that she was removing B.D. from the CiTi BOCES program. (*Id.*). The next day, she requested a different program for B.D. that would "properly" address his developmental needs and safety. (*Id.* at ¶ 77). She specifically requested a program with ABA

therapy due to B.D.s "escalating self-harming behaviors and resulting injuries including a potential traumatic brain injur[y]." (*Id.*). The superintendent indicated that he would contact the CiTi BOCES program to "request if they would consider getting a BCBA[4] on staff to support B.D." (*Id.*). Plaintiff Rose D. never heard back from the superintendent. (*Id.*).

### F.    2023 Until Present

On October 11, 2023, the CSE chair informed Plaintiff Rose D. that another program, the Tradewinds program, would not work for B.D. due to its strict limit on how far students could be transported. (*Id.* at ¶ 78). The next day, the CSE chair indicated that the District would place an application on B.D.'s behalf to the Tradewinds Residential Program, which is designed for children ages 5-21 diagnosed with severe behavioral and/or developmental disabilities. (*Id.* at ¶ 79). At B.D.'s annual IEP review on October 26, 2023, the CSE did not recommend any autism-specific services, including ABA therapy. (*Id.* at ¶ 80). Instead, the CSE recommended for B.D. to return to the CiTi BOCES program. (*Id.*; Dkt. No. 14-8, at 15). Additionally, the CSE chair informed Plaintiff Rose D. that if she did not re-enroll B.D. back in school or submit paperwork for homeschooling, she would be reported to Child Protective Services for educational neglect. (Dkt. No. 1, ¶¶ 79–80; Dkt. No. 14-8, at 3).

The notes from the IEP review meeting stated that the CiTi BOCES staff "reported that B.D. was progressing in that program and that they could support his educational and behavior needs," and that there was a "decrease in physically aggressive behaviors since the beginning of the program." (Dkt. No. 1, ¶ 82; Dkt. No. 14-8, at 3, 5). However, B.D. failed to meet any of the goals set out for him in the 2022-2023 school year. (Dkt. No. 1, ¶ 84). Additionally, according to B.D.'s Progress Report for Goals and Objectives for the 2022–2023 school year, his aggressive

---

[4] Plaintiffs do not define "BCBA," but the Court assumes that it refers to a Board-Certified Behavior Analyst.

11

behaviors increased by 307% between December 2022 and May 2023, from 384 incidents in December 2022/January 2023 to 1,258 incidents in April 2023/May 2023. (*Id.* at ¶ 83). The meeting notes also stated that B.D. was receiving daily ABA therapy in Liverpool, New York, "which the CSE refused to provide transportation to." (*Id.* at ¶ 81).

The day after the IEP review meeting, Plaintiff Rose D. sent the District and CiTi BOCES a letter from B.D's pediatrician stating that ABA therapy has been "incredibly helpful" for B.D. and given his aggression issues, "ABA therapy is the most helpful therapy he can receive at this time. Prioritizing this is the utmost importance to help him be able to get the most from his education moving forward." (*Id.* at ¶ 85). The doctor expressed his concern that without "more resolution" of B.D.'s aggression issues, "there is almost no way that his time at school is well utilized." (*Id.*). He was also concerned with B.D.'s safety and the safety of school personnel given B.D.'s then-current level of functioning and aggression. The doctor explained that they were exhausting all of their medical modalities to help B.D., and that he was available for any questions or concerns. (*Id.*). According to Plaintiffs, neither Defendant followed up with B.D.'s pediatrician. (*Id.*).

Plaintiff Rose D. kept B.D. out of school for the 2023-24 school year due to her concerns for his safety and "the lack of appropriate intervention and services as recommended by his medical providers, specifically the lack of ABA therapy." (*Id.* at ¶ 87). Instead, she enrolled B.D. in an ABA therapy program full time, "per medical recommendation," to reduce B.D.'s maladaptive behaviors before returning him to school. (*Id.*). As of November 2022, B.D. has been receiving twenty-five to thirty hours per week of ABA therapy at home and in a clinic. (*Id.*).

On July 6, 2024, Plaintiff Rose D. attended a meeting with her representative, the District's attorney, the CSE chairperson, the CiTi BOCES director, and the Sandy Creek Elementary School principal. (*Id.* at ¶ 88). She was informed that ABA therapy was incompatible with the program offered at CiTi BOCES and that the CSE "could not recommend ABA in an IEP." (*Id.*).

In February 2025, B.D.'s pediatrician renewed his recommendation for B.D. to receive ABA therapy as part of his educational program. (*Id.* at ¶ 93). His letter stated that B.D. "has had significant improvement over the recent past in his aggressive behaviors, thank in very large part to his ABA therapy," and that given this "extensive" ABA therapy, the doctor was able to take B.D. off of his antipsychotic medication. (*Id.*). B.D. was on this medication "due to his aggressive behaviors, and now he no longer needs this" which is "excellent for his long term health." (*Id.*). In addition, going off this medication led to B.D. becoming "healthier overall with a significant drop in his BMI from 31 (well above the 97%) to 24 (97%)." (*Id.*). The doctor noted that he believed ABA therapy is "serving [B.D.] very well and prioritizing this continues to be incredibly important to help moving forward." (*Id.*). According to Plaintiffs, "[d]espite B.D.'s pediatrician's recommendation, Defendant School District continued to refuse to provide ABA therapy to B.D. in school." (*Id.* at ¶ 94).

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The Court must accept as true all factual

13

allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). Thus, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)). The Court will grant a motion for judgment on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 340 (S.D.N.Y. 2008) (quoting *Burns Int'l Sec. Servs., Inc. v. United Plant Guard Workers of Am. Loc. 537*, 47 F.3d 14, 16 (2d Cir. 1995)).

## IV.   DISCUSSION

Both Defendants move to dismiss the complaint for failure to state a claim, and Defendant District also moves to dismiss any claims that accrued prior to the 2022-2023 school year as untimely.

### A.   Title II of the ADA and Section 504 Disability Discrimination Claims

Title II of the ADA and Section 504 of the Rehabilitation Act both protect qualified individuals with disabilities. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under Section 504, "[n]o otherwise qualified

14

individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Because the standards adopted by the two statutes are nearly identical," courts in the Second Circuit consider the merits of these claims together. *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)); *Hendrix v. Annucci*, No. 20-CV-743, 2021 WL 4405977, at *10, 2021 U.S. Dist. LEXIS 183934, at *26–27 (N.D.N.Y. Sep. 27, 2021).

To allege a prima facie case of discrimination under either Title II of the ADA or Section 504, a plaintiff must show that: "(1) plaintiff is a 'qualified individual with a disability;' (2) plaintiff was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by [the] public entity;' and (3) 'such exclusion or discrimination was due to [plaintiff's] disability.'" *Mount Vernon Sch. Dist.*, 837 F.3d at 158 (alteration in original) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d. Cir. 2009). In addition, a Section 504 claim requires the plaintiff to show that the defendant receives federal funding. *Davis v. Shah*, 821 F.3d 231, 260 n.17 (2d Cir. 2016). In order to recover monetary damages, the plaintiff must show that the discrimination was intentional. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (citing *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998) ("The law is well settled that intentional violations of . . . the ADA and the Rehabilitation Act[] can call for an award of money damages."), *abrogated on other grounds by Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *vacated*, 527 U.S. 1031 (1999)).

Neither Defendant disputes that B.D. is a qualified individual with a disability or that each Defendant receives federal funding. However, both Defendants dispute that B.D. was

15

excluded or discriminated against, (Dkt. No. 14-11, at 8–17; Dkt. No. 18-8, at 5–6, 9–12), and that each Defendant acted with the requisite intention, (Dkt. No. 14-11, at 9–10, 17; Dkt. No. 18-8, at 6–9).

### 1.    Failure to Make Reasonable Accommodations

Under Title II of the ADA or Section 504, "[e]xclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make reasonable accommodation." *Vinluan ex rel. D.V. v. Ardsley Union Free Sch. Dist.*, No. 19-CV-6496, 2021 WL 3193128, at *6, 2021 U.S. Dist. LEXIS 140265, at *20 (S.D.N.Y. July 27, 2021) (quoting *Mount Vernon Sch. Dist.*, 837 F.3d at 158). Although the complaint does not clearly identify the theory of discrimination, it does allege that Defendants failed to accommodate BD's disability by, inter alia, failing to provide ABA therapy, (Dkt. 1, ¶¶ 120, 147), and Plaintiffs have cited to this theory in their opposition to the motions.

Discrimination can manifest as a failure to make reasonable accommodations because both Title II of the ADA and Section 504 require that qualified individuals with disabilities receive "reasonable accommodations" to provide them with "meaningful access" to public services. *See Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004). Under the Rehabilitation Act's implementing regulations, "[a] recipient that operates a public elementary . . . program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33. "[T]he provision of an appropriate education is the provision of regular or special education and related aids and services that (i) *are designed to meet individual needs of handicapped persons as the needs of nonhandicapped persons are met* and (ii) are based upon adherence to procedures that satisfy the requirements of [related regulations]." 34 C.F.R. § 104.33(b)(1) (emphasis

16

added). The implementation of an IEP made in accordance with the IDEA is one way to meet the standard established in 34 C.F.R. § 104.33(b)(1)(i).

"[T]he relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)); *see also Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam) (Title II of the ADA and Section 504 "require only that covered entities make 'reasonable accommodations' to enable' "meaningful access" to such services as may be provided, whether such services are adequate or not."). That being so, reasonable accommodations need not be "optimal" accommodations. *A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012), *aff'd* 513 F. App'x 95 (2d Cir. 2013) (citing *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003) for the proposition that the Title II of the ADA "does not authorize a preference for disabled people generally," and *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) for the proposition that Section 504 "does not require the perfect elimination of all disadvantage that may flow from the disability."). "[A] demand for 'reasonable accommodations to assure access to an existing program' is cognizable, but a demand for 'additional or different substantive benefits' is not. *Streck v. Bd. of Educ.*, 280 F. App'x 66, at *1 (2d Cir. 2008) (quoting *Wright*, 230 F.3d at 548).

Defendant District argues that Plaintiffs' dispute is about "the *sufficiency* of the student's program, not his *access* to a federally funded program." (Dkt. No. 14-11, at 10–11 (emphasis in original)). CiTi BOCES similarly argues that "this is a dispute regarding the sufficiency of B.D.'s program, not access to the program itself." (Dkt. No. 18-8, at 9). Both Defendants rely on

17

B.D.'s IEPs, which exemplify the special education services, related services, and accommodations that B.D. has already received. (*See* Dkt. No. 14-11, at 11–16; Dkt. No. 18-8, at 10–12). Plaintiffs counter that this dispute involves Defendants' "refusal to provide a medically recommended therapy that is a prerequisite for the child's proper functioning in school and, without which, the student cannot have access to the programs and services offered by the [Defendants]. (Dkt. No. 16, at 16; Dkt. No. 19, at 19).

Because all the parties raise issue with ABA therapy specifically,[5] the Court evaluates whether Plaintiffs' request for ABA therapy was a request for a reasonable accommodation to enable B.D.s' meaningful access to education, or whether it was merely a request for "additional or substantive benefits." *See Streck*, 280 F. App'x at *1.

Plaintiffs allege that:

 "Defendants have excluded B.D. from participation in, and denied him the benefits of the services, programs, or activities offered to B.D.'s neurotypical peers, and have discriminated against B.D. on the basis of his disability by failing to . . . [c]onsider making ABA services available to B.D. as part of his educational program or services . . . despite the fact that Defendants knew that B.D. needed and was entitled to such behavioral treatment approach to accommodate reasonably his educational disabilities and allow him to enjoy meaningful access to education."

(Dkt. No. 1, ¶ 97(f)).

Plaintiffs' complaint explains the severity and frequency of B.D.'s behaviors at school. During B.D.'s first year in the CiTi BOCES program, his "aggressive behaviors, toileting accidents, and emotional dysregulation continued to escalate resulting in physical injuries to

---

[5] (See Dkt. No. 14-11, at 16–17 (District arguing that its "reluctance to acquiesce to the Parent's preferred autism methodology fails to state a claim for a violation of Section 504 of the Rehabilitation Act"); Dkt. No. 18-8, at 5 (CiTi BOCES construing Plaintiffs' complaint as using "Section 504 and the ADA to compel CiTi BOCES to provide Applied Behavior Analysis (ABA) therapy"); Dkt. No. 16, at 16 (Plaintiffs responding to District that its claims "involve the Defendant's refusal to provide a medically recommended therapy [i.e., ABA therapy] that is a prerequisite for the child's proper functioning in school, and, without which, the student cannot have access to the programs and services offered by the Defendant"); Dkt. No. 19, at 19 (Plaintiffs responding the same to CiTi BOCES))

B.D." (*Id.* at ¶ 65). In the course of that school year, B.D.'s classroom aides made "200+ pages of journal entries . . . for self-injury, staff injury, aggression to peers/staff, injury by peers, and extensive toilet play/intentional urination incidents." (*Id.* at ¶ 72). The frequency of B.D.'s physically aggressive behaviors increased by 307% during the 2022-23 school year, from 384 occasions between December 2022 and January 2023 to 1,258 occasions between April and May 2023. (*Id.* ¶ 83). Within a three-month span, B.D. came home from school with two head injuries. (*Id.* at ¶¶ 70, 76). "B.D. also failed to meet the goals set out for him in his IEP for the 2022-2023 school year." (*Id.* at ¶ 84).

In response to these incidents, Plaintiff Rose D. made several appeals to Defendants throughout the course of the school year for ABA therapy to address these behaviors. She shared her concern for B.D.'s safety to the District's CSE chair, "but neither Defendant addressed B.D.'s mothers concerns." (*Id.* at ¶ 67). She called the CiTi BOCES principal to "express concerns about B.D.'s escalating toileting accidents," (*id.* at ¶ 68), which required her to send B.D. to school with three extra clean outfits every day by March 2023, (*id.* at ¶ 66), and resulted in B.D. "bringing home 4 to 5 soiled outfits daily" by June 2023, (*id.* at ¶ 73). Per the complaint, Plaintiff Rose D. requested Defendants to provide ABA therapy for B.D. on multiple occasions. (*See id.* at ¶¶ 65, 73–74, 77, 88). In addition, she submitted two letters from B.D.'s pediatrician; one in 2023 "stating that ABA therapy was necessary for B.D. to have access to an education," (*id.* at ¶ 85), and one in 2025, when the doctor renewed his recommendation for ABA therapy, (*id.* at ¶ 93).

Plaintiffs allege that Defendants refused to provide B.D. with ABA therapy each time she requested it, (*see id.* at ¶¶ 65, 73–74, 88), and each time B.D.'s doctor recommended it, (*id.* at ¶¶ 86, 94). In addition, Defendants did not provide any alternative accommodations to address

B.D.'s physical aggression and toileting incidents, (*see id.* at ¶¶ 77–79). Throughout the school year, despite B.D.'s "lack of academic progress and behavior concerns," the District's CSE "did not recommend any positive behavior interventions, autism specific program or services, including ABA therapy." (*Id.* at ¶ 61).

In sum, the complaint plausibly alleges that the severity of B.D.'s behaviors significantly interfered with his ability to obtain meaningful access to the educational services provided for in his IEP. Although Plaintiff Rose D. repeatedly requested ABA therapy to address these behaviors, Defendants refused each time and failed to propose an alternative accommodation. At this early stage of the case, the Court finds that Plaintiffs have plausibly alleged that Defendants failed to provide B.D. with a reasonable accommodation to enable his meaningful access to education.

The case law on which Defendants rely is distinguishable. For example, both Defendants cite *Zahran v. N.Y. Dep't of Educ.*, 306 F. Supp. 2d 204 (N.D.N.Y. 2004) for the proposition that "Rehabilitation Act claims must be dismissed where 'plaintiffs are in essence challenging the adequacy of the educational services and not any illegal discrimination.'" (Dkt. No. 14-11, at 9 (quoting *Zahran*, 306 F. Supp. at 212)); *see also* Dkt. No. 18-8, at 12 (quoting *Zahran*, 306 F. Supp. at 212)).

In *Zahran*, a student with autism and a history of physical aggression was suspended after hurting school staff. *Id.* at 206. The school district's committee on special education proposed an Interim Alternative Education Setting (IAES) for the student while it worked with his parents to develop a new IEP. *Id.* at 206–07. The parents objected to the IAES, citing a need for further evaluations, and the State of New York Department of Education's ("NY DOE") hearing officer did not approve it. *Id.* at 207.  Instead, the hearing officer ordered a new IAES. *Id.* The parents

refused to comply, objecting to "the layout of the instruction room and the authorization to physically restrain [the student] if he became violent." *Id.* The impartial hearing officer made modifications, but the parents still appealed to the NY DOE's review officer. *Id.* The review officer issued a decision eighteen months later, finding the IAES adequate, but concluding that the student was denied a free appropriate public education in the three months between his suspension and the implementation of his IAES. *Id.* at 207–08. The parents then filed a federal lawsuit alleging, inter alia, a failure to make reasonable accommodations under Section 504. *Id.* at 208. Specifically, they claimed that the NY DOE "failed to make necessary evaluations to develop a proper IEP for [the student], and that it failed to offer prompt administrative review." *Id.* at 213. The district court dismissed the claim, concluding

> Plaintiffs would be hard-pressed to argue [the student] was denied meaningful access to a federally funded program. Indeed, their challenge is more related to the substantive contours of what would comprise the program as applied to [the student]. Even assuming that certain components requested by plaintiffs were rejected, or that the [State of New York Department of Education] unreasonably failed to utilize or adopt certain components, plaintiffs' challenge can only be said to be directed at the substance or adequacy of the program, and not to any decision to deprive [the student] of access to the program itself.

*Id.* at 213-214.

In *Zahran*, the student's parents objected to the school's failure to conduct certain evaluations, the layout of the special education instruction room, whether staff would be permitted to physically restrain the student if he became violent, and whether the student would ultimately receive a full day of instruction in a "regular education room." *Id* at 207. This challenge to the IAES was more in the nature of a substantive challenge to the program itself, than a demand for an accommodation necessary to provide the student with meaningful access to his education. Here, on the other hand, Plaintiffs aver that Defendants' refusal to reasonably accommodate B.D.'s disability with ABA therapy—"a prerequisite for the child's proper

21

functioning in school"—prevented B.D. from having access to the educational services provided for in his IEP. (Dkt. No. 16, at 16; Dkt. No. 19, at 19). Here, the Plaintiffs plausibly allege that B.D.'s behaviors were so severe that Defendants' refusal to provide reasonable accommodations to address that behavior excluded him from having meaningful access to his education.

### 2.    Deliberate Indifference

Defendants argue that the complaint must be dismissed because Plaintiffs have failed to plausibly alleged deliberate indifference. (Dkt. No. 14-11, at 10; Dkt. No. 18-8, at 6). Plaintiffs respond that the standard is no longer deliberate indifference following the Supreme Court's decision in *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335, 342–43 (2025). (Dkt. No. 16, at 8 (citing *Osseo*, 605 U.S. at 345); *see also* Dkt. No. 19, at 8–9). The Court disagrees.

In *Osseo*, the Supreme Court struck down the heightened "bad faith or gross misjudgment" showing that the Eighth Circuit applied to education-adjacent ADA or Section 504 claims. 605 U.S. at 344–45. The Supreme Court held that "ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts." *Id.* at 345. The Supreme Court noted that "courts of appeals generally agree that a plaintiff must show intentional discrimination" "[t]o obtain compensatory damages." *Id.* at 344. And a majority of the Courts of Appeals "find the requirement to show 'intentional discrimination' satisfied by proof that the defendant acted with 'deliberate indifference.'" *Id.*; *see, e.g., Garcia v. S.U.N.Y. Health Scis. Ctr.*, 280 F.3d 98, 115 (2d Cir. 2001) (noting validity of prior holding that "a plaintiff may recover money damages under either Title II of the ADA or § 504 of the Rehabilitation Act upon a showing of a statutory violation resulting from 'deliberate indifference' to the rights secured the disabled by the acts." (citing *Bartlett*, 156 F.3d at 331 (2d Cir. 1998)); *Loeffler*, 582 F.3d at 275 (stating that plaintiffs must show deliberate indifference to recover monetary damages under the Rehabilitation Act). Thus,

in order to prevail on their claims for money damages under Title II of the ADA and Section 504, Plaintiffs must plausibly allege that Defendants' alleged discrimination was intentional.

"Intentional discrimination may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy.'" *Loeffler*, 582 at 275; *Marshall v. N.Y. State Pub. High Sch. Athletic Ass'n, Inc.*, 374 F. Supp. 3d 276, 298 (W.D.N.Y. 2019) (same); *see also Osseo*, 605 U.S. at 345 ("[T]o show deliberate indifference, it is enough that a plaintiff prove the defendant disregarded a 'strong likelihood' that the challenged action would 'result in a violation of federally protected rights.'" (quoting *Meagley v. Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011))).

Plaintiffs allege that "[a]t all relevant times, Defendants knew that B.D. was a student diagnosed with autism spectrum disorder ("ASD")." (Dkt. No. 1, ¶ 21). During the 2022-23 school year, the first year B.D. attended the CiTi BOCES program, Plaintiff Rose D. informed Defendants of her concerns for B.D.'s safety due to his escalating aggressive behaviors, physical injuries, emotional dysregulation, and toileting incidents. (*See id.* at ¶¶ 65, 67). She showed the District's CSE chair and the superintendent "200+ pages of journal entries from B.D.'s aides, which showed numerous entries for self-injury, staff injury, aggression to peers/staff, injury by peers, and extensive toilet play/intentional urination incidents." (*Id.* at ¶ 72). She expressed her concerns about B.D.'s toileting incidents to the CiTi BOCES principal. (*Id.* at ¶ 68). By the end of the school year, B.D.'s average instances of physical aggression increased by 307% from December 2022 to May 2023, (*id.* at ¶ 83), and he "failed to meet any of the goals set out for him for the 2022-2023 school year, contradicting CiTi BOCES' staff report of progress, (*id.* at ¶ 84. *Compare* Dkt. No. 14-7, at 8–9, *with* Dkt. No. 14-8, at 5–8). Plaintiff Rose D. informed the

23

District's CSE chair and superintendent of "the very limited window of opportunity available for B.D. to address his communication and emotional impairments lest his development be permanently harmed," and that he experienced success with ABA therapy outside of school. (Dkt. No. 1, ¶ 75).

Plaintiffs allege that "Defendants knew or should have known that Applied Behavior Analysis ("ABA") is the most well-researched and validated approach to treatment of autism spectrum disorder ("ASD")," (*id.* at ¶ 24), and that "scientific evidence confirms the effectiveness of ABA interventions in the development and improvement of the cognitive function, language skills, intelligence quotient (IQ), adaptive skills, and social abilities in young children with autism when such ABA interventions are delivered early in an intensive and comprehensive manner," (*id.* at ¶ 25).

Plaintiffs further allege that Defendants were provided with notes from B.D.'s doctor regarding the importance of ABA therapy to his development and its benefits in treating his aggressive behaviors. In October 2023, B.D's pediatrician reported that ABA therapy has been "incredibly helpful for [B.D]," and that "[p]rioritizing [ABA therapy] is the utmost importance to help [B.D.] be able to get the most from his education moving forward." (*Id.* at ¶ 85). Given B.D's aggression issues, the doctor opined that ABA therapy is "the most helpful therapy he can receive at this time" and that "until these aggression issues are more resolved, there is almost no way that his time at school is well utilized." (*Id.*). In addition, the pediatrician expressed "concern[] for the safety of the school employees and [B.D.] with his current level of functioning and aggression." (*Id.*). Two years later, the doctor continued to recommend ABA therapy for B.D., noting its success outside of school in treating B.D.'s aggression: "[B.D.] has had significant improvement over the recent past in his aggressive behaviors thank in very large part

24

to his ABA therapy." (*Id.* at ¶ 93). Because of the "extensive" ABA therapy B.D. had been receiving, the doctor took B.D. off of the antipsychotic medication prescribed for his aggression, which is "excellent for his long term health." (*Id.*). The pediatrician concluded that "the ABA therapy he is receiving is serving him very well and prioritizing this continues to be incredibly important to help moving forward." (*Id.*).

Plaintiff Rose D. made several appeals to both Defendants to address B.D.'s severe behavioral impairments with ABA therapy, but Defendants refused each time. (*See id.* at ¶¶ 65, 73–74, 86, 88, 93–94). Plaintiffs allege that the District responded that "it was unable to provide B.D. with this 'medical treatment,'" (*id.* at ¶ 73), the CSE chair "had not heard of anyone doing ABA therapy through an IEP or the CSE process," (*id.* at ¶ 74), and was told that "ABA therapy was not compatible with the program offered at CiTi BOCES, (*id.* at ¶ 88). Plaintiff Rose D. offered to pay for a BCBA to help train the aides and to provide B.D. with ABA at school, but stopped when "CiTi BOCES staff failed to implement the BCBA's recommendations." (*Id.* at ¶ 69). In response to the toileting incidents, the CiTi BOCES principal told Plaintiff Rose D. that "the aides stated they were not comfortable addressing B.D.'s behaviors from occurring and that they lacked the necessary training." (*Id.* at ¶ 68).

Moreover, Plaintiffs allege that the District made multiple assurances to look into alternative placements for B.D., but that they never followed up on them. The District's officials "agreed to look for other programs that would better support B.D.'s needs, but no such program was ever recommended for B.D." (*Id.* at ¶ 73). In July 2023, the District's superintendent "stated that he would contact CiTi BOCES to request if they would consider getting a BCBA on staff to support B.D." but Plaintiff Rose D. "never heard back from the superintendent after this telephone conversation." (*Id.* at ¶ 77). In October 2023, the CSE chair emailed Plaintiff Rose D.

to inform her that the District would place an application on B.D.'s behalf to a residential program for children with severe behavioral and/or developmental disabilities, but that the CSE was also recommending that "B.D. return to the CiTi BOCES program." (*Id.* at ¶ 79).

Here, Plaintiffs sufficiently allege that both Defendants were on notice of B.D.'s severe behavioral impairments arising from his autism, B.D. was not meeting any of the goals set out in his IEP, Defendants knew the benefits of ABA therapy and that those benefits applied to B.D, and that Plaintiff Rose D. requested ABA therapy multiple times. Plaintiffs claim that by repeatedly refusing to provide ABA therapy in the face of that knowledge, Defendants were deliberately indifferent to B.D.'s right to receive services necessary for him to have meaningful access to education. At this stage, construing all of the allegations in the light most favorable to Plaintiffs, they have plausibly alleged that Defendants acted with deliberate indifference. *C.f. Robert F. v. N. Syracuse Cent. Sch. Dist.*, No. 18-CV-00594, 2021 WL 3569108, at *9, 2021 U.S. Dist. LEXIS 151648, at *26 (N.D.N.Y. Aug. 12, 2021) (finding, on summary judgment, that a genuine issue of material fact existed as to whether the Defendants "chose to ignore the scientific and medical evidence supporting the provision of intensive ABA therapy to G.F. in school, even though various experts agreed that without intensive ABA therapy services in school, G.F. would not be able to make social and academic progress" and also that a rational juror could find that "this decision rises to the level of gross negligence or reckless indifference.")

The authority Defendants rely on are not analogous. For example, in *A.H. v. N.Y.C. Dep't of Educ.*, No. 24-CV-4828, 2025 WL 2773252, at *12, 2025 U.S. Dist. LEXIS 192160, at *38 (S.D.N.Y. Sep. 29, 2025), the district court granted the Defendant's motion for summary judgment on a Section 504 claim following a two-day administrative hearing and an

26

administrative appeal. In *A.H.*, the parents of a student with ASD and other disabilities objected to the student's IEP because it "did not expressly include ABA." 2025 WL 2773252, at *2, *7, 2025 U.S. Dist. LEXIS 192160, at *5, *23. Although the student's IEP did not "explicitly use the term 'ABA' . . . it included a recommendation for schooling and programming that addressed substantively similar issues as ABA would target," and the student's parents were informed of "the availability of ABA tutoring" at the recommended school. 2025 WL 2773252, at *9, 2025 U.S. Dist. LEXIS 192160, at *26–27. Moreover, it did not appear that there was a clear consensus regarding the necessity of ABA therapy for the student in light of concerns regarding the restrictiveness of his environment, his need to develop social skills, and the doctor's failure to "clarify her evaluation" at the CSE meeting. 2025 WL 2773252, at *8, 2025 U.S. Dist. LEXIS 192160, at *25. The district court found that the administrative record "d[id] not support a finding of deliberate indifference or bad faith for substantially similar reasons [to its affirmance of the state review officer's finding that the student was not denied a free appropriate public education]." 2025 WL 2773252, at *12, 2025 U.S. Dist. LEXIS 192160, at *38. Specifically, the court found that defendant "earnestly and carefully evaluated a number of assessments and evaluations in crafting the IEP, proposed a plan to help [the student] progress in targeted areas, and specifically considered [a doctor's] recommendation, but concluded that it would be too restrictive." 2025 WL 2773252, at *12, 2025 U.S. Dist. LEXIS 192160, at *38. The Court concluded that this was "a far cry from the kind of indifference necessary to support a Section 504 claim." *Id.*

By contrast here, there is no indication on this record that Defendants offered alternate accommodations that "addressed substantively similar issues as ABA would target." 2025 WL 2773252, at *9, 2025 U.S. Dist. LEXIS 192160, at *26–27. Instead, Plaintiffs have alleged that

27

Defendants did not offer any alternate programs that could address B.D.'s needs. (Dkt. No. 1, ¶¶ 73, 77, 79). Nor does this record reflect any consideration of the necessity of ABA therapy to B.D.'s education. The facts in *A.H.* are not analogous to the allegations here.

In sum, at this early stage of the case, and construing the allegations in the complaint in the light most favorable to Plaintiffs, they have sufficiently alleged that Defendants failed to offer B.D. reasonable accommodations for his disability, and that they acted with deliberate indifference.

### B.    Statute of Limitations

The District argues that Plaintiffs' claims must be dismissed to the extent that they are untimely. (Dkt. No. 14-11, at 18). Specifically, they state that "[a]ny claims that accrued prior to the 2022-2023 school year must be dismissed as untimely" because Title II of the ADA and Section 504 both have a three-year statute of limitations. (*Id.*). Plaintiffs respond that they "allege facts that predate the three-year statute of limitation not as independent claims, but as evidence of discrimination," and that "there is not [*sic*] statute of limitations on evidence." (Dkt. No. 16, at 18).

Courts in this circuit have applied a three-year statute of limitations to New York-based claims brought under the ADA and the Rehabilitation Act. *See Purcell v. N.Y. Inst. of Tech.*, 931 F.3d 59, 63 (2d Cir. 2019) (ADA); *Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 687 (S.D.N.Y. 2011) (Section 504). To the extent that Plaintiff alleges claims that accrued before the 2022-23 school year, they are untimely.

Evidence predating the statute of limitations may be *relevant* to a plaintiff's claim*. See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (in the context of a Title VII employment discrimination claim, finding that an untimely discriminatory act "may constitute relevant background evidence in a proceeding where the status of a current practice is at issue");

28

*Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (in the context of a breach of contract claim, finding that the statute of limitations does not bar the admissibility of evidence that predates the statute of limitations period but is relevant to events within that period). The parties have not addressed what "evidence of discrimination" predating the statute of limitations the Court may or should consider in determining  whether the timely failure-to-accommodate claims under the ADA and Section 504 survive a motion to dismiss. (*See* Dkt. No. 16, at 18–19; Dkt. No. 14-11, at 18). In any event, the Court has not considered any allegations predating the 2022-23 school year in determining whether Plaintiffs have stated claims here.[6]

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant District's motion to dismiss (Dkt. No. 14) is **DENIED**; and it is further

**ORDERED** that Defendant CiTi BOCES's motion for judgment on the pleadings (Dkt. No. 18) is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>May 29, 2026</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[6] The Court has recounted Plaintiffs' factual allegations from 2017–2021 in Section II.B., *supra*, only to provide context for Plaintiffs' timely claims and because the District referenced these allegations in their motion to dismiss. (*See* Dkt. No. 14-11, at 11–14).